

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00181-CR

_____


STANLEY BRUCE ROBERSON, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 278th District Court
Leon County, Texas
Trial Court No. 16-0239CR


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Stanley Bruce Roberson was stopped for speeding on Interstate 45 near Centerville, Texas,[1] and consented to a search of his vehicle by Department of Public Safety (DPS) Trooper Mike Asby. While searching the vehicle's trunk, Asby found in the spare tire eleven zip-locked bags of pills, each bag containing approximately one pound of differently colored pills. Although different in color, all of the pills contained the "Rolling Stones tongue" logo. Asby believed the pills to be narcotics. That belief was ultimately supported by laboratory testing of a random sample of the peach-colored pills, and Roberson was convicted by a jury of possession of a controlled substance in Penalty Group 1, an amount greater than 400 grams,[2] in the form of just the peach-colored pills and was sentenced to sixty years' imprisonment.[3]

On appeal, Roberson claims that the evidence is legally insufficient to support the verdict and that this Court should conduct a factual sufficiency review of the evidence. Because (1) the evidence is legally sufficient to support the verdict and (2) we are precluded from reviewing the factual sufficiency of the evidence, we affirm the trial court's judgment.

---

[1]Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to Section 73.001 of the Texas Government Code. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(f) (West 2017).

[3]Roberson pled true to two enhancement allegations. Consequently, the punishment range for this offense was enhanced to the range of punishment applicable to a habitual offender. *See* TEX. PENAL CODE ANN. § 12.42(c)(1) (West Supp. 2017).

*(1)*    *The Evidence Is Legally Sufficient to Support the Verdict*

So the pills seized from Roberson could be analyzed, Asby delivered a sealed box with the bags of pills[4] to the DPS laboratory in Waco. After analysis, Asby retrieved the sealed box from the laboratory. He later noticed that the pills had been sorted by color and placed in eight new bags by color. Asby testified that the pills returned to him by the DPS were the same ones that he recovered at the scene of the traffic stop. Based on the one-pound weight of each original bag, Asby estimated that he confiscated a total of 11,000 pills.

James Milam, a forensic scientist with the DPS crime laboratory in Waco, testified that, when he received the eleven zip-locked bags from Asby, he subdivided the pills into their individual colors for analysis. Milam explained that, to perform a statistical sampling plan on the evidence, he sorted the pills by color and analyzed the peach-colored pills.

The statistical sampling plan involves the use of a statistical approach to make an inference about the entire population of tablets. Here, Milam used what he referred to as the ninety percent sampling plan. The sample was taken from only one newly sorted bag of pills, which contained, by Milam's count, 2,373 peach-colored pills. From that group, Milam tested twenty-nine pills. When asked to explain why he chose twenty-nine pills to test, Milam explained that, in accordance with standard DPS operating procedure, he used a table that reflects analysis requirements. The

---

[4]When Asby stopped Roberson, he became suspicious that Roberson did not speak much and did not make eye contact with Asby. Asby asked Roberson to exit the vehicle. Roberson denied having anything illegal in his vehicle and consented to a search. After Asby arrested Roberson, he placed the zip-locked bags in a locked compartment of his patrol vehicle. The following Monday, Asby transported the zip-locked bags in a sealed box to the DPS laboratory in Waco. He returned to the DPS laboratory the following Friday and picked up the box containing the pills. The pills were returned to Asby in the same box in which they were originally transported. When Asby opened the box the day before trial, he noticed that DPS had separated the pills by color and placed them in eight new bags. The eleven original pill bags were in the bottom of the box.

table indicates that, for any amount over 940 items, twenty-nine of those items must be tested in accordance with the "ninety percent sampling plan."[5] Stated differently, the plan requires that testing of twenty-nine randomly selected pills must consecutively yield the "exact same result."

The process of determining the identity of a substance begins with a preliminary examination. In this case, Milam performed a chemical spot test. That test consists of taking a small amount of the unknown substance, applying a reagent to it, and documenting the color of the chemical reaction caused by the application of the reagent. The process is then repeated with a second chemical reagent. This part of the process takes approximately forty to forty-five minutes.

These two analyses were performed on all twenty-nine pills. Each pill tested turned orange in the presence of the initial marquis reagent, suggesting the presence of amphetamine. The second reagent, sodium nitroprusside, was then applied to each of the twenty-nine pills. The application of this reagent elicited a blue color reaction, suggesting the presence of a secondary amine. Because the pills tested positive for the presence of amphetamine together with a secondary amine, Milam testified that he was likely dealing with methamphetamine.

After having completed the reagent portion of the testing process, Milam proceeded to conduct a confirmatory analysis on each of the twenty-nine pills. This procedure consisted of an instrumental analysis in which the pills were prepared for extraction by placing a small amount of each pill in a test tube containing a base solution and chloroform. The test tubes were then placed in a gas chromatograph mass spectrometer. The spectrometer separates the components based on

---

[5]It is DPS policy to use the statistical sampling plan for amounts in excess of 940 samples.

their physical and chemical properties by means of an electron ionization detector, which causes the molecules to fragment. Milam explained that molecules have specific fragmentation patterns unique to certain drugs. The fragmentation pattern is then compared to a known literature source, which permits confirmation of the substance. The confirmatory analysis indicated that each of the twenty-nine pills contained methamphetamine.

Milam testified that, if any one of twenty-nine consecutive tests yielded a different result, then the statistical sampling plan could not be used. In this case, however, the test results were the same for each of the twenty-nine pills tested. The requirements of the statistical sampling plan were therefore satisfied. According to Milam, the results of the statistical sampling in this case reflected a ninety-five percent confidence level that at least ninety percent of the 2,373 peach-colored pills contained methamphetamine.[6]

Milam also weighed the entire number of peach-colored pills from which the twenty-nine tested pills were taken. To weigh the pills, Milam first weighed the entire bag of pills. He then emptied the bag of the pills, weighed the bag, and subtracted the weight of the bag in order to ascertain the pills' weight. The total weight of the pills from which the twenty-nine sample pills were tested was 578.90 grams. And, although some of the pills contained different cutting agents, each of the twenty-nine pills tested contained methamphetamine.[7] Ninety percent of 578.90 grams,

---

[6]Without the statistical sampling plan, approximately 1,600 tablets would need to have been tested to reach the 400-gram threshold. That would take approximately thirty days to accomplish, assuming testing occurred twenty-four hours a day for seven days a week.

[7]Milam tested only pills from the bag containing peach-colored pills, and Roberson was charged only with possessing the peach-colored pills. Note that 400 grams is the highest relevant weight threshold to warrant the most severe punishment, so the State did not need to establish the contents or weight of the non-peach-colored pills. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(f).

5

according to Milam's calculation, is 521.0 grams. That amount is in excess of the 400 grams of methamphetamine Roberson was charged with possessing.

Roberson complains that the evidence is not sufficient to prove beyond a reasonable doubt that he possessed at least 400 grams of methamphetamine. Specifically, Roberson argues that Milam's testimony is scientifically unreliable because his identification of ninety percent of the remaining 2,373 pills as containing methamphetamine is based on a positive test result for only twenty-nine pills.

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of *Brooks*, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence against the challenged elements of the offense using a hypothetically correct jury charge applicable to the case. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). That hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof

6

or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Like Roberson, the appellant in *Melton v. State*, 120 S.W.3d 339, 341 (Tex. Crim. App. 2003), maintained that the evidence was legally insufficient to prove the alleged amount of a controlled substance because the State did not test enough of the substance to meet the alleged weight amount. In *Melton*, the arresting officer found a small plastic bag sticking out of the top of appellant's shorts. *Id.* at 340. The bag contained approximately thirty-five to forty rocks of a substance that appeared to the arresting officer to be crack cocaine. *Id.* At trial, a chemist for the DPS testified that he tested "an unspecified number of rocks using an ultraviolet spectrophotometer and a gas chromatography mass spectrometer, confirming that each contained cocaine. He admitted, however, that he did not test every rock." *Id.* at 341.

The intermediate appellate court determined that "the testing of only a representative component from a group of items suspected to contain cocaine is not evidence of the composition of all the items absent proof that the tested items are truly representative." *Id.* at 341 (citing *Melton v. State*, 85 S.W.3d 442, 444 (Tex. App.—Austin 2002, pet. granted)). In reversing that decision, the Texas Court of Criminal Appeals noted that all of the rocks were found in one plastic bag, "thus fortifying the inference that all of the rocks, like the ones tested, contained cocaine." *Id.* at 342. Moreover, the jury heard testimony that all of the rocks of crack cocaine were found in one bag and was permitted to inspect the bag and its contents in order to see the similarities in appearance. *Id.* at 343. It was therefore reasonable for the jury to infer that the untested rocks contained cocaine. *Id.* at 344.

7

In reaching this conclusion, the *Melton* court relied on *Gabriel v. State*, 900 S.W.2d 721 (Tex. Crim. App. 1995). In that case, the State seized from a "trap house" fifty-four baggies, each of which contained two or three individual "rocks." *Id*. at 721–22. The contents of just five of the fifty-four bags were tested, however. Those test results revealed that the substance tested in each of the five bags was ninety-nine percent cocaine. *Id*. at 722. The State's expert further testified that the total weight of the tested material was 2.237 grams, the total weight of the contents of all fifty-four baggies was 35.2 grams, and the contents in the baggies that were not tested contained only cocaine. *Id*. Further, the contents of the remaining bags had been judged identical on visual inspection. It was, therefore, "rational for the fact[-]finder to conclude that identically packaged substances, which appear to be the same substance, are in fact the same substance." *Id*.

Here, Milam described his education and experience as a forensic scientist, the tests he conducted to identify the methamphetamine, and the procedures used in the DPS laboratory to ensure accuracy of the tests. Although Milam tested only twenty-nine of the 2,373 peach-colored pills, he testified that the pills tested were selected at random from the bag containing all of the peach-colored pills, the pills tested were the same color as the untested pills from that bag, and they all bore the Rolling Stones tongue logo. Based on this random sampling technique, Milam testified that he was ninety-five percent confident that ninety percent of the untested peach-colored pills contained methamphetamine. The jury was free to believe this testimony and determine what weight to give it.

On these facts, a rational fact-finder could conclude that the tested and untested peach-colored pills bearing the same logo were, in fact, the same substance. This is especially true in

light of Milam's unchallenged testimony that he was ninety-five percent certain that ninety percent of the remaining pills contained methamphetamine.[8]

When viewed in the light most favorable to the prosecution, this evidence is legally sufficient to support the jury's conclusion that Roberson possessed a controlled substance in Penalty Group 1 in an amount greater than 400 grams.

*(2)        We are Precluded From Reviewing the Factual Sufficiency of the Evidence*

In his other point of error, Roberson acknowledges that the Texas Court of Criminal Appeals has eliminated factual-sufficiency review in criminal appeals in Texas. *Brooks*, 323 S.W.3d at 901. Even so, Roberson invites this Court to conduct such a review, claiming that "[t]reating civil and criminal litigants differently for purposes of access to factual sufficiency review violates the Factual Conclusivity, Equal Protection, Due Process[,] and Open Court provisions of the Texas Constitution." In *Brooks*, the Texas Court of Criminal Appeals determined that the legal-sufficiency standard is "'indistinguishable' from a factual-sufficiency standard" because "the jury is 'the sole judge of a witness's credibility, and the weight to be given their testimony.'" *Id.* at 901–02 (quoting *Lancon v. State*, 253 S.W.3d 699 (Tex. Crim. App. 2008)). We find this point of error to be without merit.

---

[8]The *Gabriel* court concluded that "the manner of testing the substances by random sampling goes only to the weight the jury may give to the tested substances in determining the untested substance is the same as the tested substance." *Gabriel*, 900 S.W.2d at 722.

9

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     June 19, 2018
Date Decided:       July 20, 2018

Do Not Publish